# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Criminal No. 04-128 (RMC)** |
| v. | : | |
| | : | |
| **JOHN FRANKLIN, et al.** | : | |
| **(John Franklin,** | : | |
| **William Simmons,** | : | |
| **Joe Blackson** | : | |
| **Anthony Davis** | : | |
| **Jonte Robinson** | : | |
| **Regina Lenear)** | : | |
| _____ | : | |

## GOVERNMENT'S OPPOSITION TO DEFENDANTS' MOTION TO SUPPRESS WIRETAP EVIDENCE

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully opposes defendants Franklin's, Simmons,' Blackson's, Davis,' Robinson's and Lenear's motions to suppress wiretap evidence (Documents 379, 383, 392 & 339, 366 &381, along with 380, 347, and 343).  As grounds for this opposition, the United States relies on the following points and authorities and  such other points and authorities as may be cited at a motions hearing.

## I.  Facts

A. **Franklin Wire.**

On August 5, 2003,  the United States applied for an Order from the Honorable Emmet G. Sullivan authorizing the authority to intercept communications occurring to and from telephone number 202-257-5481, used by target user John L. Franklin.  The application for authorization to intercept communications to and from said cellular telephone number was supported by probable

cause to believe that targeted interceptees Johnathan L. Franklin, " Joseph L. Blackson, a.k.a. "Joe Black," Kenneth Dodd, a.k.a. "K-Dog," or "K," Larry Gooch, a.k.a. "Goo," Jonte D. Robinson, a.k.a "Tay," Anthony Davis, a.k.a "Football," Michael Abney, a.k.a. "Mike," Jamal Hinson, Shawn Hinson, a.k.a. "Jack," Candice Howard, Tamika Coffey, a.k.a. "Mika," William Dee Robinson, a.k.a "Dee," Diamond White, Regina Lenear, Latisha Sinclair, a.k.a."Tish," and Eric Williams, [1] and others who were yet unknown, (hereinafter "targets"), and others were committing federal offenses involving: (i) possession with intent to distribute and distribution of controlled substances, in violation of  21 U.S.C. § 841(a)(1);  (ii) conspiracy to commit such offenses, in violation of 21 U.S.C. § 846;  (iii) use of communications facilities to facilitate the commission of the above offenses involving controlled substances, in violation of 21 U.S.C. § 843(b); and, (iv) money laundering, in violation of 18 U.S.C. §§ 1956 and 1957.  The requested Order was granted on August 5, 2003, authorizing electronic surveillance over the cellular telephone for a period of thirty (30) days.  Electronic surveillance began on August 7, 2003, and the court granted authority to extend the period of interceptions.  On October 3, 2003, law enforcement terminated the Franklin intercept.  A total of 6917 calls were intercepted.

### B.    Martin Wire.

On October 24, 2003,  the United States applied for an Order from the Honorable Emmet G. Sullivan authorizing the authority to intercept communications occurring to and from telephone numbers 202-465-2531, 202-281-4974, and 202-390-5217, used by target user Herbert E. Martin.

---

[1]  This group was added in the extension request:  Elizabeth Lee, a.k.a "Liz,  Ceaser C. Harris, a.k.a. "Seez," James Hill, a.k.a. "Foxy," Herman Walker, a.k.a. "Shug," Edward Spears, a.k.a. "Junior," Jacqueline Franklin, Dwayne Williams, a.k.a "Scooter," Tracy Ambers, Kenneth Cole, a.k.a. "Cricket."

The application for authorization to intercept communications to and from said cellular telephone numbers was supported by probable cause to believe that targeted interceptees Herbert E. Martin, a.k.a. "Big Herb," Johnathan (sic hereinafter) L. Franklin, Elizabeth Lee, a.k.a "Liz," and other persons who were not likely to be intercepted, but who remained target violators in the overall conspiracy, and whose backgrounds were set forth in the earlier affidavit for the interception of Franklin's telephone (Joseph L. Blackson, also known as "Joe Black," Kenneth Dodd, a.k.a. "K-Dog," or "K," Larry Gooch, a.k.a. "Goo," Jonte D. Robinson, a.k.a "Tay," Anthony Davis, a.k.a. "Football," Michael Abney, a.k.a. "Mike," Jamal Hinson, Shawn Hinson, a.k.a. "Jack," Latisha Sinclair, a.k.a."Tish," Candice Howard, Tamika Coffey, a.k.a. "Mika," William Dee Robinson, a.k.a. "Dee," Diamond White, Regina Lenear, Ceaser C. Harris, a.k.a. "Seez," James Hill, a.k.a. "Foxy," Herman Walker, a.k.a. "Shug," Edward Spears a.k.a. "Junior," Jacqueline Franklin, Dwayne Williams, a.k.a "Scooter," Tracy Ambers, Kenneth Cole, a.k.a. "Cricket," and Eric Williams, and others as yet unknown, (hereinafter "targets") were committing the following offenses: (i) Possession with Intent to Distribute and Distribution of Controlled Substances, in violation of Title 21 United States Code, Section 841(a)(1); (ii) Conspiracy to commit such offenses, in violation of Title 21 United States Code, Section 846; (iii) Use of Communication Facilities to Facilitate the Commission of the above offenses involving controlled substances, in violation of Title 21 United States Code, Section 843(b); (vi) and the laundering of proceeds of specified unlawful activity, e.g., the distribution of controlled substances, in violation of Title 18 United States Code, Section 1956 and 1957. The requested Order was granted on October 27, 2003, authorizing electronic surveillance over the cellular telephone for a period of thirty (30) days. Electronic surveillance began on all three phones on October 28, 2003, and was terminated on phone number 202-465-2531

on the same day.  Electronic surveillance continued on the remaining two numbers until November 22, 2003.  A total of  2078  calls were intercepted.

## II. Issues

John Franklin makes the following challenges to the admission of wiretap evidence:

1.)  There was inadequate probable cause to support the issuance of the wiretap authorization and the extension, to find that "particular conversations" regarding concerning narcotics trafficking or violent offenses within the target neighborhood would be intercepted; 2.) The affidavit failed to establish "necessity" as contemplated in 18 U.S.C. §3518(c); 3.)  The Government failed to comply with wiretap statues involving the appropriate   minimization for non-pertinent intercepted conversations; 4.)  the second extension of Franklin's wiretap should not have been approved considering the successes of the first thirty days; and 5.)  With respect to the Herb Martin wiretap, again, the affidavit failed to satisfy the "necessity" prong of 18 U.S.C. §3518(c).

Joe Blackson challenges the admission of the wiretap evidence by arguing that the affidavit was facially deficient on its face in that it did not meet the "necessity" requirement ( 18 U.S.C. §3518(c)) because it failed to show that normal investigative procedures were exhausted to justify the wiretap.  He also joined in Franklin's motion (page 2, Blackson's Document 383).

None of the other defendants filed substantive motions attacking the wiretap. Simmons joined in both Franklin's and Simmons' motions, Davis joined in Franklin's and Simmons' motions, Robinson joined in Blackson's motion and Lenear joined in Franklin's motion.

<u>III. Argument</u>

A. <u>Standing</u>

Only an "aggrieved person" who has otherwise been a victim of a Fourth Amendment intrusion may move to suppress evidence derived from a wiretap authorization. 18 U.S.C. §2518(10)(a). Section 2510(11) defines an "aggrieved person" as "one who was a party to any intercepted wire, oral or electronic communication or a person against whom the interception was directed." The Supreme Court has held that in order for a defendant to have standing to seek suppression of electronic surveillance evidence, the surveillance must be "violative of his own Fourth Amendment right to be free of unreasonable searches and seizures." <u>Alderman v. United States</u>, 394 U.S. 165, 176 (1969)  ("Such violation would occur if the United States unlawfully overheard conversations of a [defendant] himself or conversations occurring on his premises, whether or not he was present or participated in those conversations") <u>Id</u>.  <u>See also</u> <u>United States v. Scott</u>, 504 F.2d 194, 197 (D.C. Cir. 1978) <u>aff'd</u>, 436 U.S. 128. ("The prohibition against assertion of another's rights normally would preclude an aggrieved person from suppressing a conversation in which he did not participate.")

Franklin was intercepted on both his wire and the Martin wire, as such he has standing to challenge both.  Blackson has standing to challenge the Franklin wire as he was intercepted on it, but he was not intercepted on the Martin wire and does not have standing to challenge the Martin wire.  Similarly, Lenear, Davis and Simmons were intercepted on the Franklin wire but not the Martin wire and Robinson was not intercepted on either wire.  Accordingly, their standing is limited.

5

**B.     The Affidavits for Franklin and Martin were legally sufficient**

An order for the interception of wire or oral communications may be issued if the court finds probable cause[2] to believe that (1) a person is committing one of the enumerated crimes in Title III, (2) communications concerning such an offense will be obtained through interception, and (3) the facilities from which the communications are to be intercepted are being used in connection with that offense.   18 U.S.C. §2518(1) and (3).

**i. There was adequate probable cause**

Contrary to Franklin's (and others) assertions, both his wire and Herb Martin[3] wiretap were replete with probable cause to believe that both Franklin and Martin were using their cell phones to facilitate their drug trafficking venture. Franklin argues that because the examples of his phone usage to facilitate drug deals in the affidavit occurred at the behest of undercover officers or cooperating witnesses –  that is, they called Franklin to arrange the drug transactions –  there is no information upon which the judge could have made an independent determination of probable cause that there were other drug-related conversations or violence- related conversations likely to be intercepted.

This argument is contrary to the evidence set forth in the affidavit. The information in the affidavit demonstrated that every time a government agent called Franklin to set up a drug deal, he used the phone to arrange a drug deal. This implies he did not discontinue the conversation nor suggest an alternative means of communication.  When he then met with the undercover officers face to face , he neither discouraged further phone calls nor suggested another means of communication.

_____

[2] The probable cause standard in 18 U.S.C. Sec. 2518(3)(a) and (b) is the same that is used to obtain ordinary search warrants.  See e.g. United States v. Tehfe, 722 F.2d 1114, 1118 (3rd Cir. 1983).

[3] Franklin concedes factual probable cause for the Martin wire (Document 379, p.13).

Moreover, on one occasion, Franklin himself initiated a call to the undercover officer, when he returned her phone call.  (¶ 32 of Corrected Affidavit).[4]  On another occasion, Franklin used his phone to arrange with William Dee Robinson to deliver PCP to the undercover officer as Franklin was not in the vicinity.  (¶ 33). Another time, during a meeting with the undercover officer, Franklin used his phone to call another person when he realized he was short the amount of PCP the undercover officer sought. (¶34).

Pen register[5] information presented in the affidavit demonstrated that during a four month period of time, from January 1, 2003 to May 1, 2003, there were 11,821 activations on Franklin's phone, of which 8,324 were incoming calls.  (¶ 36). Using the pen register results, agents were able to determine that 26 of those calls were between Franklin and  Kenneth Dodd, a person believed to be the primary ecstasy pill distributor for the 18th and M St. crew and a person from whom undercover officers had purchased narcotics during January to June, 2003.  One hundred sixteen (116) of the calls were between Franklin and his brother,  Joe Blackson, a person who sold PCP for Franklin and  from whom undercover officers had also purchased narcotics during this investigation. Incidentally, agents had also engaged Blackson in phone calls to facilitate drug deals through him.

---

[4]  Unless noted, the remaining paragraph citations are to the first affidavit for the wiretap, entitled "Corrected Affidavit."  The "Corrected Affidavit" is attached as an exhibit to Document 379, Franklin's motion to suppress wiretap evidence.

[5]The pen register orders executed in this investigation allowed law enforcement to record and analyze the phone numbers dialed from a target telephone and to identify and analyze the phone numbers associated with incoming calls.  Law enforcement agents use a combination of investigative techniques to link a particular phone to a target suspect.  For example, law enforcement use the subscriber information from the phone company, confidential informant information, cooperating defendant information, information learned by an undercover officer engaged in purchasing drugs from a target, and a variety of other techniques to ascertain which target is using which telephone.

Twenty-one (21) of the calls were between Franklin and Larry Gooch, a main supplier of crack for the crew and, again, someone from whom agents had purchased narcotics during this investigation. Two hundred eight (208) of the calls were between Franklin and William Dee Robinson, a person who sold for Franklin and who responded to Franklin's request – made over the phone – when Franklin needed someone to deliver narcotics. Forty -two (42) calls were between Franklin and Shawn Hinson, someone identified as a seller for Franklin and someone from whom agents also purchased narcotics during this investigation. (¶ 37).

The wiretap affidavit demonstrates more than adequate probable cause.[6] In any event, the good faith exception articulated in United States v. Leon, 468 U.S. 897 (1984) has been extended by numerous courts to electronic surveillance. See United States v. Moore, 41 F.3d 370 (8th Cir. 1994). Any infirmities in probable cause would thus be cured by a good faith reliance on the Federal District Court's determination that there was sufficient probable cause. This Circuit has yet to rule on the applicability of the good faith exception to the exclusionary rule in the realm of wiretap law. The wiretap statute however, provides its own statutory suppression scheme for non-constitutional violations of the wiretap statute. 18 U.S.C. §2518(10).

---

[6] When assessing probable cause for warrants, [t]he task of the issuing magistrate is simply to make a practical, common- sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for . . . conclud[ing]" that probable cause existed. Illinois v. Gates, 462 U.S. 213, 238-39 (1983) (citing Jones v. United States, 362 U.S. 257, 271 (1960)). The issuing court's determination of probable cause "should be paid great deference by reviewing courts." Gates, 462 U.S. at 236 (citation omitted). Under LCr.R 57.10(d), only sitting judges of the U.S. district Court are permitted to review wiretap affidavits. Magistrates are not so permitted. Nevertheless, the guidance on determining probable cause is still applicable.

### ii.    Necessity and exhaustion were amply demonstrated

Title 18 U.S.C. §2518(1)(c) provides that each application for an order authorizing electronic surveillance must contain:

> A full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.[7]

Similarly, prior to granting an order authorizing a wiretap, an issuing judge must find, among other things, that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. §2518(3)(c). These prerequisites to a wiretap are commonly known as the "necessity" and "exhaustion" requirements.

The purpose of the statutory exhaustion requirement is to ensure that "wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime," and to inform the issuing judge of the difficulties inherent in the use of traditional techniques. United States v. Kahn, 415 U.S. 143, 153 n.12 (1974). But "the burden that these provisions impose upon the government to show the inadequacy of normal investigative techniques is not great, and the adequacy of such a showing is to be tested in a practical and common sense fashion." United States v. Anderson, 542 F.2d 428, 431 (7th Cir. 1976); accord, United States v. Armocida, 515 F.2d 29, 38 (3rd Cir.), cert. denied, 423 U.S. 858 (1975); United States v. Webster, 473 F. Supp. 586, 595 (D.Md. 1979) (statutory burden on the government is not great in showing compliance with exhaustion requirement), aff'd, 639 F.2d 174 (4th Cir.), cert. denied, 454 U.S. 857

---

[7] Necessity does not require the government exhaust every conceivable investigative technique before receiving authorization for a wiretap, just that those other investigative techniques reasonably appear unlikely to be successful or are too dangerous.

(1981), modified on other grounds, 669 F.2d 185 (4th Cir. 1982), cert. denied, 456 U.S. 935 (1991); United States v. Askins, 351 F. Supp. 408, 414 (D.Md. 1972)(government's burden of establishing exhaustion is not great).

Moreover, 18 U.S.C. § 2518(c) does not require the literal exhaustion of all normal investigative techniques. United States v. Clerkley, 556 F.2d 709, 715 (4th Cir. 1977) ("police need not exhaust every conceivable technique before making application for a wiretap"), cert. denied, 436 U.S. 930 (1978). The statute requires only "that the agents inform the authorizing judicial officer of the difficulties inherent in the use of normal law enforcement methods." United States v. Torres, 901 F.2d 205, 231 (2d Cir.) (citations omitted), cert. denied, 498 U.S. 906 (1990); United States v. Sobamowa, 892 F.2d 90, 93 (D.C. Cir. 1989) (the government is not required to enumerate in its affidavit every technique or opportunity missed or overlooked), cert. denied, 498 U.S. 825 (1990). Rather, the government need show only that other techniques would be impracticable. United States v. Johnson, 696 F.2d 115, 123 (D.C. Cir. 1982); see also, United States v. Torres, 908 F.2d 1417, 1422 (9th Cir.) (although generally a wire intercept should not constitute the first step in an investigation, the government need not exhaust every conceivable investigative technique in order to show necessity), cert. denied, 498 U.S. 905 (1990); United States v. Garcia, 785 F.2d 214, 223 (8th Cir.) ("affidavit need not explain away all possible alternate techniques because investigators are not required to use wiretaps or eavesdropping devices only as a last resort"), cert. denied, 475 U.S. 1143 (1986). A "standard of reasonableness should be employed in measuring the affidavit against the statutory requirements." United States v. Oriakhi, 57 F.3d 1290, 1298 (4th Cir.) (showing of necessity is "'to be tested in a practical and commonsense fashion,' . . . that does not 'hamper

unduly the investigative power of law enforcement agents'" (citations omitted)), cert. denied, 516 U.S. 952 (1995); United States v. Spagnuolo, 549 F.2d 705, 710 (9th Cir. 1977).

The United States Court of Appeals for the District of Columbia Circuit has recognized and applied the above-cited principles.  United States v. James, 494 F.2d 1007, 1016 (D.C. Cir. 1974) ("Merely because a normal investigative technique is theoretically possible, it does not follow that it is likely" [to succeed].).  The Court has said that even though merely conclusory statements about necessity will not suffice, even conclusory statements "cannot rationally be separated from . . . preceding detailed descriptions of . . . investigative events."  United States v. Sobamowo, 892 F.2d 90, 93 (D.C. Cir. 1989) (quoting Williams, 580 F.2d at 589).

Measured by the applicable legal principles described above, the wiretap authorization order issued in this case was amply supported by the government's showing of "necessity" and "exhaustion."  The government was thorough  in its applications in explaining all the investigative techniques it had undertaken before it applied for the initial wiretap authorization of defendant Franklin's telephone.  The affidavit submitted by Special Agent Stallings (FBI)  in support of the authorization for wire interceptions on defendant Franklin's telephone included as purposes of the interceptions the nature, extent, and methods of operation of the narcotics trafficking activities in which interceptees and others as yet unknown are engaged; identities, roles and telephone numbers of co-conspirators; the source, distribution and location of money and narcotics involved in those activities; existence of  houses, apartments and other premises used in furtherance of illegal activity; the existence, location and source of proceeds of the activity; existence of other items used in furtherance of those activities; dates, times, and details for the continued commission of the above-

mentioned offenses; and other evidence necessary for the successful prosecution and conviction of the above described activities (¶ 12).

As set forth in the affidavit, several less intrusive investigative techniques had been used or contemplated and found insufficient to accomplish the goals of the investigation. The techniques included law enforcement surveillance, debriefing of individuals who had been arrested in the target area or who stated they had information; consensual recording of phone calls, controlled purchases, the use of a CCTV (pole camera), analysis of pen register data and air time record for Franklin's phone, review of public records, the use mail covers, prison logs, cooperating witnesses and use of undercover personnel. (¶ 49). Agent Stallings explained with respect to each of these investigative techniques, as well as others, such as search warrants and grand jury subpoenas, the results of using the technique, and/or why it was not used. (¶ 52-57).

Defendant Blackson posits that normal investigative procedures were producing results and that to identify Franklin's supplier, law enforcement could have requested "an unusually large purchase of narcotics prompting Franklin to call suppliers" whose identity could then be determined from pen register information. He asserts that witness testimony, bank records and search warrants could have been obtained to show the extent of the organization. He argues that pen registers coupled with surveillance could have been used to identify members of the conspiracy. The limitations with Blackson's suggestions are readily apparent - asking for a large supply would have aroused Franklin's suspicions and would put the undercover officers in danger; when people use phones that are not registered in their own name (as is most often the case) it is not always possible to determine who was on the line. Not only would it be unlikely that witnesses would report to a grand jury and voluntarily implicate themselves or tell on their friends, such techniques would have tipped off the organization

12

that they were the subject of a federal investigation. Traditional financial planning is not used by drug dealers[8] and subpoenaing bank records would be fruitless. Search warrants would have warned the crew they were being investigated and it would not be possible to conduct surveillance based on pen registers as the information is not communicated on a real time basis.

Franklin asserts that continued street surveillance would have been sufficient to identify his co-conspirators and that agents already had "ample" information about the crew members. He similarly claims that pen registers were sufficiently helpful to law enforcement to render interceptions an unnecessary intrusion. The difficulties, as the affidavit explained, were that the closed circuit television, because of the distance, could not pick up voices or conversations and, because of its technological limitations, could not record useful images at night because of the low lighting conditions. Counter-surveillance by the co-conspirators alerted everyone as to when the block was "hot." Pen registers are useful to determine what number communicated with Franklin, but it cannot identify the caller or provide a basis by which further surveillance can be had.

With respect to the extension, Franklin argues that those formerly demonstrated to be useless methods should have been revisited and that law enforcement already knew enough from a single month of successful interceptions. Franklin argues the extension was not necessary because, during the first thirty day period, law enforcement learned that Herbert Martin was Franklin's supplier. Yet as the second affidavit made clear, the objectives were broader than just the identification of Martin as the supplier. The source or supplier of the ecstasy and crack had not yet been identified. (¶ 41 of the Affidavit for Continued Authorization). Whether Martin was Franklin's sole PCP supplier or just

---

[8] As demonstrated by the fact that George Wilson kept $83,000 in cash in shoe boxes in his closet and Franklin had $20,000 in a Prada bag in the bedroom and $35,000 in a safe deposit box. None of this information could be gleaned from bank records.

one of several had not been determined. (Id. ¶ 57). The inner workings of the crew had not yet been revealed. (Id. ¶ 54). The affidavit in support of the extension demonstrated that the government had not yet reached "attainment of the authorized objective." 18 U.S.C. Sec. 2518(5). There is simply no obligation to terminate a wiretap when sufficient evidence to prosecute has been gained against some of the targets or even if a major player in the conspiracy under investigation has been arrested, so long as the phone involved continues to be used for the conspiratorial activity. United States v. Newman, 733 F. 2d 1395, 1400 (10th Cir. 1984) (proper to continue surveillance even after search of target's home where the tapped phone was located since the "search of the defendant's residence did not foreclose the possibility that defendant would call or receive calls or visits from as yet unidentified members of the drug conspiracy).

Finally, Franklin argues that there was no justification for the Herb Martin wiretap as it was "nonsensical that further revelation into the structure, hierarchy and workings of the organization would be obtained through Martin." Law enforcement could have determined his supplier through pen registers which showed that the calls had a New York connection. Surveillance could have revealed with whom he had exchanges of items. Other investigations may be ongoing from which law enforcement could have gotten information, and additional trash runs could have revealed more about the drug conspiracy.

Quite simply, while it was logical to think that Martin would be calling his own supplier, it was not logical to think a pen register, which only shows previous numbers called and received, would reveal the identity of this person. Surveillance would only be successful if Martin and his supplier were brazen enough to make a delayed exchange of a readily identifiable item in the public view. To suggest there were other viable investigative techniques is speculative at best, as is the

likelihood that Martin would record, then discard in the trash, vital identifying information about his

co-conspirators and suppliers. Even with the aid of hindsight, the defendants do not make out a claim

that the Government failed to comply with the provisions of 18 U.S.C. §2518(c).

**C.      Minimization**

The defense assertion that the wiretap should be suppressed because of the alleged failure to

minimize the interceptions of non-pertinent telephone conversations is an allegation totally devoid

of merit. The statute requires that the Government make a reasonable effort to minimize the privacy

invasion of intercepted conversations that are identifiable as non-pertinent to the wiretap purpose.

So for example, when suspect is using the phone to order a pizza as opposed to say, a quantity of

PCP, agents are supposed to "minimize," that is, use a toggle switch to turn off the interception and

not record the non-pertinent conversation. Actually, the defense complains that "it is unclear whether

or not law enforcement followed any type of minimization." (Document 379, Franklin suppression

motion, p.10). The government provided to the defense compact disks that contained the audio calls

as well as the wire summaries. CD 111 contains the Franklin wire summaries for each one of the

6917 calls. Displayed on the top right of each page of the summary, is the information that shows

whether or not that call was minimized. CD 12 and CD 13 likewise shows which of the Martin calls

were minimized.[9]

Contrary to the assertion in defendant Franklin's suppression motion, the burden is on the

defendant to show a prima facie pattern of insufficient minimization over the period of the

_____

[9]Consequently, Franklin's motion erroneously claims that absent the disclosure of the period reports (10 day wiretap reports) it is impossible to say whether the U.S. met its minimization burden. Each defense counsel has a set of the above compact disks and has the ability to ascertain and count the number of minimized phone calls and can do so independent of the disclosure of any other document.

surveillance in order to make out a claim for suppression.  United States v. Giacalone, 853 F. 2d 470, 482 (6th Cir. ), *cert. denied*, 488 U.S. 910 (1988) ("Defendant's argument is premised on the assumption that the government bears the burden of production and persuasion concerning its compliance with the minimization requirements.  However, the law is clear in this Circuit that 'the burden of production and persuasion rests on the person seeking to suppress evidence...'").

The Supreme Court decision in Scott v. United States,  436 U.S. 128, 140, (1978), held that 18 U.S.C. §2518(5) does not forbid interception of all non-pertinent conversations, but rather, it requires a reasonable effort to minimize them.  The reasonableness of the efforts to minimize should be determined only after examination of the totality of the circumstances in each case.  Id., at 140-142.  Consequently, in resolving these issues the court should familiarize itself with the minimization circumstances of this case.

Defense counsel for Franklin alludes to the notion that a statistical analysis of the number of minimized phone calls would demonstrate a failure on the part of the Government to comply with the minimization requirements.  Since the Supreme Court decision in Scott, supra, rejected the notion that compliance with minimization standards can be determined by a mere statistical analysis, courts have resorted to a case by case analysis to apply the "totality of the circumstances test." United States v. Oriakhi, 57 F.3d 1290, 1300 (4th Cir. 1995)(applying the Scott standards found in Scott, Id., 436 U.S. 128, 140-142.).  Reasonableness is the standard.  Scott, supra.  The wiretap statute does not require that all innocent conversation be left un-intercepted.  It requires that unnecessary intrusions into the speaker's privacy be minimized.  Oriakhi, Id., at 1300.  The minimization requirement is satisfied if on the whole the agents have shown a high regard for the right of privacy and have done all they reasonably could to avoid unnecessary intrusion. Oriakhi, Id., at 1300 (citing United States v.

16

<u>Armocida</u>, 515 F.2d 29, 42 (3d Cir.), <u>cert</u>. <u>denied</u>, <u>sub</u> <u>nom</u>. <u>Contia v. United States</u>, 423 U.S. 858, 96 S.Ct. 111 (1975).

Although other Circuits state the law similarly, one need not look beyond our Circuit's rulings to find controlling precedent.   The standard governing compliance with 18 U.S.C. §2518(5)'s requirement to minimize interception of innocent conversations, is "one of reasonableness." <u>United States v. Wilson</u> 835 F.2d 1440, 1445 (D.C. Cir. 1987)(quoting <u>United States v. James</u>, 494 F.2d 1007, 1018 (D.C. Cir.), <u>cert. denied</u>, 419 U.S. 1020 (1974)).  The <u>James</u> <u>supra,</u> decision restated the standard in the following language:  "If on the whole the agents have shown a high regard for the right of privacy and have done all they reasonably could to avoid unnecessary intrusions,"  <u>Id.</u>, 1300, then the agents have met the requirement.

The <u>Wilson</u>, <u>supra</u>, decision observed that the standard or reasonableness depends upon real world problems confronting investigators.  The decision stated further, that "courts have recognized that investigation of a large, complicated conspiracy justified a relatively intensive surveillance of calls.  <u>Id.</u>, 835 F.2d at 1444. The analysis forgives strict compliance with minimization standards because it is often "impossible to determine that a particular telephone conversation would be irrelevant and harmless until it has been terminated." <u>Id.</u>, at 1446.  It permitted greater flexibility when for example, the conspirators are talking in a "colloquial code" or when the conversation started with a discussion of non-criminal matters, and thereafter, turned to a discussion of criminal activity. <u>Id.</u>, 1445.   <u>United States v. Wilson</u>, 835 F.2d 1440, 1445 (D.C. Cir. 1987) (standard governing compliance with 18 U.S.C. Sec 2518(5)'s requirement to minimize interception of innocent conversation, is "one of reasonableness" (citation omitted)). In rejecting a claim that agents failed to minimize interceptions properly because they listened to non-criminal conversations, the United

States Court of Appeals for the District of Columbia Circuit recognized the impracticability of agents'

completely minimizing such conversations.

> The fact that the monitored conversations often started with discussion of non-criminal matters did not require the government to plug its ears. Participants in the conspiracy under investigation often discussed personal and criminal matters in the same conversation . . . . Obviously a blanket rule that the agents must always turn off after X minutes of innocent conversation would created a privileged sanctuary for illegal conversations.

Id. at 1445-46.

The Scott standards were also applied in this circuit in United States v. Anderson, 39 F.3d 331

(D.C. Cir. 1995). (Later this decision was reversed but only as to the portion that dealt with multiple

counts of violations of 18 U.S.C. §924(c) – use of firearms in a drug trafficking crime linked to a

single underlying predicate offense.). The Anderson decision invoked the standard of reasonableness

and noted that even if the minimization requirement had been violated, suppression might not be an

appropriate remedy. Id., 342. Anderson rejected a similar claim of non-compliance with

minimization based on a statistical analysis. There, only 10% of the non-pertinent calls were

minimized in a drug conspiracy investigation. Anderson rejected the claim summarily and noted that

such statistics "prove nothing." Id., 342.

Other courts have similarly been skeptical of reliance on statistical analysis as an indicator of

non-compliance with minimization. For example, In United States v. Bennett, 219 F.3d 1117 (9th Cir.

2000), the Ninth Circuit remarked that statistical analysis is an "inaccurate indicator of whether or

not the government complied with the minimization requirement." Id., at 1124. Further, that same

case commented that where the wire interception concerns a drug conspiracy, there is a paramount

need to allow agents latitude in monitoring. "The fact that the FBI overheard a few innocent

conversations does not render its minimization efforts unreasonable." Id., at 1124. The opinion also

remarked that where phone conversations included guarded or coded language, or where there is a wide-ranging conspiracy, a higher rate of non-relevant intercepted calls should be expected because it takes longer to figure out the meaning of a particular call. Id., at 1124.

In all the Franklin and Martin wiretaps, the conversations about narcotics trafficking at times were intertwined with discussions of non-criminal matters.  Moreover, the participants routinely used coded language when discussing their drug trafficking activities.  Conversations often were ambiguous, making it difficult to determine whether or not the participants were talking about legal or illegal activities.  The reasonableness analysis of minimization permits greater flexibility when the conspirators are talking in a "colloquial code" or when the conversation started with a discussion of non-criminal matters, and thereafter, turned to a discussion of criminal activity.

Moreover, the fact that  individual calls involving non-criminal activity were intercepted does not justify  suppression of the wiretap evidence. Monitoring agents were not  obliged to cease monitoring every time a non-criminal matter was mentioned. See United States v. Scott, 436 U.S.128, at 140 ("statute does not forbid interception of all non-relevant conversations"); United States v. James, 494 F.2d 1007, 1019 (D.C. Cir. 1974) (where participants discuss both innocent and criminal activity, agents may be justified in monitoring all conversations). "The interception of some innocent, non-pertinent conversations is 'inevitable.'" United States v. Costello, 610 F. Supp. 1450, 1477 (N.D. Ill. 1985), aff'd sub nom, United States v. Olson, 830 F.22d 195 (7th Cir. 1987), cert denied, 484 U.S. 1010 (1988). "The mere interception of calls unrelated to the drug conspiracy does not indicate a failure to meet the minimization requirement." Torres, 908 F.2d at 1423 (citing Scott, 436 U.S. at 140-141).

Accordingly, even if the court were to find some infirmity with the affidavit (inadequate probable cause, failure to demonstrate necessity or exhaustion), the agents reasonably relied on a warrant that was *not* so lacking in the indicia of probable cause as to render official belief in its existence, entirely unreasonable.  We submit, however, that the defendants' arguments regarding necessity and exhaustion are without merit.  The Government urges the Court to deny these motions.

Respectfully submitted,

KENNETH L. WAINSTEIN
United States Attorney
Bar No. 451-058

By:    _____
        DARLENE M. SOLTYS
        Bar No. 431-036
        202-514-8147
        JOHN P. DOMINGUEZ
        Bar No. 959-809
        202-514-7060
        Assistant United States Attorneys
        555 4th Street, N.W.
        Washington, D.C. 20530
        **Counsel for United States**

**<u>Certificate of Service</u>**

I certify that on this 21st day of November, 2005, a copy of the foregoing motion was served on counsel for the defense: Elita Amato, Esq. (for John Franklin), James Lyons, Esq. (for Anthony Davis), John Carney, Esq. (for Joe Blackson), Theresa Kleiman, Esq. (for Regina Lenear), Edward Sussman, Esq. (for Jonte Robinson) and Eduardo Balarezo Esq. (for William Simmons) through the court's ECF filing system.

_____
Darlene M Soltys and John P. Dominguez