**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **THE UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **CRIMINAL NO. 04-128 (RMC)** |
| | ) | |
| **JONATHAN FRANKLIN, et al.** | ) | |
| **(APRIL DODD,** | ) | |
| **KENNETH DODD,** | ) | |
| **TOMMIE DORSEY,** | ) | |
| **LARRY GOOCH,** | ) | |
| **SHAWN HINSON,** | ) | |
| **JONTE ROBINSON and** | ) | |
| **KEITH ODLE)** | ) | |
| **Defendants.** | ) | |

## GOVERNMENT'S NOTICE OF INTRINSIC EVIDENCE

The Government hereby gives notice to this Court and various counsel of the type of evidence that it intends to offer at trial that is "intrinsic" to the case. Defendant Jonte Robinson filed a Defendant's Request for Notice of the Government's Intention to Use 404(b) Evidence at Trial (Doc. # 559). Defendant Larry Gooch joined (#575), as did Defendant April Dodd (#559), Defendant Shawn Hinson (#572) and Defendant Keith Odle (#571). By this response, the Government provides notice to Defendant Robinson and the other remaining defendants, that there exists numerous uncharged acts (both criminal and non-criminal) that the Government will offer against Defendants Robinson, K. Dodd, A. Dodd, Dorsey, Hinson, Gooch and Odle. All of the evidence the government intends to elicit at this time falls outside the requirements of Rule 404(b) as it is direct evidence of the conspiracy. Rule 404(b) is an inappropriate analytical framework to evaluate evidence that is intrinsic or direct evidence of the conspiracy. As grounds for this notice, the Government states as follows:

## I. FACTUAL HISTORY OF THE INVESTIGATION

In 2003, Members of the Safe Streets Task Force (hereinafter "the task force") began a concentrated investigation into sales of PCP in a small part of the Northeast Quadrant of Washington, D.C.  This small three block area, 18th Street, 18th Place and M Streets, N.E., had become an open air PCP market that was so busy that traffic jams resulted from the number of cars that entered the area to purchase drugs.  The area was also marked by increasing violence as the drug business flourished.  This open air drug market came into existence back in the mid-1990s.

Throughout 2003, agents from the task force identified a number of street level sellers and introduced a series of undercover police officers into the block.  Through these efforts, agents were able to gather intelligence on the activities of the drug sellers that made the area their storefront.  The undercover officers were able to purchase PCP, and learned more about the supply structure of the 18th and M market.  To supplement their knowledge, agents conducted hours of video-taped surveillance of the drug sellers in 2003 and early 2004.  They developed several cooperators and confidential informants who had access indirectly to the group of drug sellers who were based in the area of 18th and M.  As a result, a significant number of PCP sales were captured on audio and/or videotape.  Eventually, through the diligent efforts of the task force members, the task force was able to identify – in 2003 –  John L. Franklin as the main supplier of PCP to the block.

In August of 2003, agents obtained court authorization to intercept a cellular telephone belonging to John L. Franklin.  The wiretap ran for 60 days and resulted in more than 6,000 recorded calls.  Through surveillance and the monitoring of calls, agents learned that John L.

Franklin was supplied by Herbert E. Martin.  In November of 2003, agents from the FBI's Drug

Squad obtained court authorization to intercept phone lines that were used by  Herbert E. Martin.

These calls, like the one before it, provided significant additional evidence of the conspiracy,

particularly pertaining to the supply of liquid PCP.

Since the day of the nationally coordinated arrests, on March 16, 2004, many members of

the conspiracy, as well as others who have direct knowledge of its members, their illegal

activities and the workings of the conspiracy,  have entered guilty pleas before this Court and

agreed to cooperate with the Government by testifying at trial.  Through cooperators and other

corroborating evidence, the Government has gained extensive knowledge of the inner workings

of the conspiracy and of the criminal activities of its members.

Through the investigation, the Government was able to investigate the historical aspect of

the conspiracy as it  flourished years before the 2003 investigation began.  The Government was

able to identify those earlier members of the conspiracy and learn of their activities prior to

2003. Thus, the Government discovered evidence pertaining to various types of criminal

ventures, from murders and assaults, to drug trafficking and weapons offenses that had occurred

prior to law enforcement investigation.

## II. EVIDENCE OF THE CONSPIRACY

A.      Testimony about Drug Sales and Acts of Violence

Most of the Government's cooperators are individuals who participated in and have

direct knowledge of the day-to-day drug trafficking activities, the violent offenses endemic to

that drug trade and other criminal and non-criminal activities committed in furtherance of the

conspiracy by themselves and other members of the 18th and M Street crew.[1]

Specifically, these witnesses will describe how John Franklin came to be the primary supplier of liquid PCP and ecstasy pills at 18th and M streets that reached its prime during 2003. Witnesses will identify known recipients of Franklin's supply, and how Franklin was himself supplied.   At this advanced stage in the conspiracy, the "M Street Crew" had evolved into a well-defined, traditional chain conspiracy, with various roles assigned to people, such as foot soldiers, runners and lieutenants.  Franklin was the primary PCP supplier in 2003, but he was not the crew's exclusive narcotics supplier.  Indeed, in this upcoming trial, it is expected that there will be much more historical, both anecdotal and direct, testimony about the supply and distribution of crack cocaine, about the influx of PCP and ecstasy pills from other suppliers before Franklin's rise and about violent crimes committed by members of the conspiracy.

At various periods of time from 1997 to 2004, April and Kenneth Dodd, Tommie Dorsey, Larry Gooch, Shawn Hinson, Keith Odle and Jonte Robinson were all members of the "M St. Crew," a group of people who had as their principle goal, the making of money through the sale of illegal narcotics at or around the 18th and M St. neighborhood.  Witnesses will describe how each of the above-named defendants sold PCP, ecstasy, and crack cocaine in and around the neighborhood. Witnesses will also identify other members of the M St. Crew and describe the roles that other co-conspirators held.

Witnesses will describe the historical and familial relationships the defendants had to

---

[1]        Cooperators will discuss instances in which crew members armed themselves with weapons and drove together in a caravan  to neighborhoods where they were involved in a dispute. On some occasions, shots were fired indiscriminately.  The indictment itself lists specific acts of violence committed by crew members.

each other and to the 18th and M Streets neighborhood. There will be testimony regarding childhood and schoolyard relationships amongst crew members. There will be testimony about how those relationships flourished into criminal associations. There will be testimony regarding the "original" members of the M St. crew and testimony about how they came to be an organized criminal enterprise that established itself for the primary purpose of making money through the sale of illicit drugs. In furtherance of this objective, members of the crew held frequent meetings amongst for nefarious purposes, such as arranging the transfer of narcotics and firearms. Meetings amongst crew members included discussion about who could and who could not sell on the M St. strip, (including thinning the ranks when too much attention came to the crew), what to do if the "feds" brought conspiracy charges, the ground rules regarding the sale of narcotics, (taking turns, not cutting each other off), discussions about who was wanted by the police and how to protect hem and the taking of collections for attorneys fees. Discussions were held regarding criminal activities undertaken by the crew or its members. Witnesses will discuss crew members tactics for evading police detection such as speaking in coded language over the telephone, concealing narcotics in stashes on the ground, in stash apartments and in vehicles. They will identify counter surveillance techniques employed by the crew. They will identify and describe incidents in which police were shot at or shots fired into the air to disrupt police presence. They will identify incidents wherein outsider drug dealer were physically harassed or chased off the strip. Witnesses will discuss quantities and methods of packaging and preparation of liquid PCP for further distribution, and the income, profit and price of such narcotics. Witnesses will do the same for crack cocaine and ecstasy pills. Witnesses will discuss practices the crew had related to fronting the narcotics.

Witnesses will detail the organizational and structural features of this enterprise, the identities and explanations of who played what role in this organization, and other practices and habits of the trade.[2]  Specifically, within the M St. Crew, Joe Blackson, (Franklin's brother), William Dee Robinson, George Wilson, Shawn Hinson and Kenneth Dodd served as Franklin's "lieutenants."  Larry Gooch was considered an "enforcer."

Moreover, cooperating witnesses will discuss violent acts, such as homicides, robberies, assaults, and shootings that were perpetrated by members of the M St. crew. Indeed, evidence will show that the crew banded together in an "all for one, one for all" mentality and that acts of violence on one, were an affront to all.  Weapons, vehicles, even defense counsel, were shared amongst members of the crew.  Shootouts with rival gangs (such as Mayfair Paradise and the 640 Crew) took place.  There were times when crew members went to a go-go club and got involved in altercations with rival gangs and the result was a fight at the club or an armed expedition to that perpetrator's "hood."

Specifically, the Government will introduce evidence of the following incidents - in

---

[2]  It would not be feasible to provide a thorough and complete overview of the testimony that will be elicited from Government witnesses.  Accordingly, this memorandum provides the highlights of the types of areas of knowledge of the conspiracy that will be the subject of testimony.  It is by no means exhaustive, and could not hope to be, without committing the entire trial to paper before a single witness is sworn.

Moreover, the Government herein incorporates by reference, its previously filed Notice of Intent, (# 477), listing evidence to be offered at the trial of the Group 1 defendants.

The Government further provides notice to these defendants that evidence presented at their trial will include evidence obtained and previously offered against their co-conspirators. This includes but is not limited to particular incidents of drug trafficking, anecdotal testimony about criminal behavior and crew association, specific evidence of the contraband (weapons, money, narcotics, paraphernalia, paperwork) recovered from that particular defendant's residence or vehicles, wiretap conversations, and pole camera video or hand held video footage showing drug dealing, meetings, associations, etc.

1997, Jonte Robinson, Tommie Dorsey and Larry Gooch were involved in an ongoing dispute with people at H Pl., NE and on several occasions, they went to that location and fired weapons. On March 17, 1997, in the 800 bock of 18th St., NE, (ie., H Pl., NE) ) Tommie Dorsey and Jonte Robinson shot a 14 year old boy, Dennis Wade, in the head.  On April 1, 1997, Tommie Dorsey and Jonte Robinson were in possession of a Tech 9, a .380 hand gun, marijuana and a stolen car. On January 21, 1997, Larry Gooch and Tommie Dorsey were in possession of a Browning .22 semi automatic handgun.   On January 10, 1997, Larry Gooch possessed with the intent to distribute, crack cocaine at 1845 M St., NE

Sometime after 2000, after Shawn Hinson was robbed while at M St., Larry Gooch and Omari Minnis attempted to retaliate by shooting at the person they thought was the robber but they mistakenly struck the car of a fellow crew member.

In June of 2003, the crew rented a Hummer limo and went to an event at the new D.C. Convention Center.  Jonte Robinson, who was wanted by the police on a homicide warrant, was apprehended despite the intervention of his crew members who fought with the police in an attempt to distract the police from arresting him.. They were, however, able to facilitate the escape of Larry Gooch, who was also wanted.  While they were gone, however, fellow crew members who remained to sell drugs were robbed.  Those who remained contacted Kenneth Dodd, who was viewed as a defacto leader of the crew, so that the crew would retaliate upon the robbers.  A meeting was held after these event to collect money for Jonte Robinson's attorney fees and to discuss limiting street sellers on occasion so that Larry Gooch could take a large numbers of customers for himself to generate funds for his own attorney fees.

Defendants Gooch, Dorsey, Robinson and many others of the crew participated in a

shooting spree with rival crew members of Mayfair Paradise. In this incident, the crew armed themselves with assault rifles and hand gun and drove over to that neighborhood in several vehicles where they fired their weapons indiscriminately. This shootout continued on the journey back to M St. while on the Rt. 295 spur. Defendants Gooch, Dorsey, Robinson and Dodd participated in a shootout with members of the 640 Crew at Park Rd. and Georgia Ave., after an incident at the Black Hole spurred the group to a violent response. Another time, defendants Gooch and Dodd, among others participated in a shootout with people from Stanton Hills.

In the summer of 2002, defendants Gooch, Odle and other crew members armed themselves with firearms and drove to 37th St. in an attempt to look for and retaliate upon persons responsible for the robbery of Kran Bell, an event that precipitated the August 24, 2002 murder of Andre McCarson by Bell. No shots were fired on this occasion. However, on another date, Gooch and other crew members did fire upon a car parked at 37th St. During testimony about the August 24, 2002 murder, a witness will testify that Gooch both encouraged and approved of this murder.

There will be other acts of violence described - a fight at Club U that resulted in the crew arming themselves for a confrontation with the guys from 6th St. SE that resulted in shootings but without casualties. Another fight at Club U involving Gooch, and thereafter weapons were retrieved from cars and fired. Witnesses will describe a myriad of times wherein individual defendants fired weapons - Gooch fired a Mak 90 into the air at M St. to shut down the block, Gooch fired at guys on Southern Ave. who he thought were about to rob him and another crew member. There will be testimony about who was known to regularly possess firearms; defendants Gooch, Dorsey, Kenneth Dodd, Dorsey and Odle fall in this category. April Dodd

does not. While Hinson has been seen with a  weapon, he was not a regular carrier.

There will be testimony about the weapons that were possessed by members of the crew. For instance,  the Mak 90 assault rifle with 85 rounds seized during the arrest of Kenneth Dodd in Nov. 2004 was originally a birthday present for Larry Gooch.  There will be testimony that Gooch stored in his apartment a Mini 14, AK-47, the Desert Eagle, various Glocks, .45 handguns and the Mak 90. Gooch gave Dodd an assault rifle as a present.  Dodd had laser sight attachments inside his apartment on March 16, 2004.

April Dodd was a member of the M St. Crew. She took Greyhound bus trips to New York City to purchase and bring back ecstasy pills. She helped her cousin Kenneth sell crack cocaine and specifically dealt with the undercover officers on September 10, 2003 (Buy 81) and October 15, 2003. (Buy 90).  She accompanied fellow crew members to go-go clubs and cabarets.

Kenneth Dodd, aka "K-Dog," was considered a leader and an enforcer for the organization.  He was involved in a supervisory role at meetings held to discuss the nature of the business wherein, among other things, members decided etiquette of the street level drug trafficking activities, how to thin the ranks of those permitted to ply their trade in the neighborhood, solicit money for attorneys fees and discuss fellow member's fugitive status.  He was someone who helped culled the ranks of who could continue to sell narcotics when the neighborhood heated up.  Dodd was considered the "brains" on the street.  He was also a source for ecstasy pills, crack or PCP.  Dodd was one of the original crew members.  He was someone perceived as a money getter; indeed a tattoo on his neck reads "Get money or die trying."  He was generous to others, giving extravagant presents such as a motorcycle, a car, tennis bracelet, trips, and clothing to crew members. He also paid bills for women who had apartments in the

neighborhood in exchange for storing contraband there.  His gun was recovered from 1226 18th

Pl. #2 on the March 16, 2004 takedown where it was stored.  Dodd packaged drugs in his

apartment and regularly cooked up crack cocaine.   He bragged that he had a killed someone.  He

threatened a newcomer to the block who started selling narcotics, but no harm came to this

person who became embraced as an insider.   Dodd often pulled his money with Gooch to

purchase a larger quantity of narcotics.  On April 30, 2003, he sold 99 fake ecstasy pills to an

undercover officer for $1000. (Buy 56).

        Shawn Hinson, aka "Jack" was another person in the second tier of Franklin's

organization and someone who participated in the meetings regarding street level marketing and

distribution.  Hinson was an original and was involved in the sale of crack on M St. back in

1997, (in fact, he was arrested for selling crack in 1995 on M St.). Hinson was both supplied by

Franklin and at times, had his own independent connection apart from Franklin.  At certain times

in his career, Hinson routinely supplied witnesses with ounce bottles of PCP and had someone

test his supply.   He was also involved in the street level distribution network, that is selling

dippers and ecstasy for individual consumption.  For a period of time, his girlfriend had a

connection for ecstasy pills and he helped her facilitate the distribution of ecstasy pills to others

in the crew.  Before Franklin became the principle supplier of PCP, Hinson attempted to

cultivate a relationship with the New York suppliers. This failed when Wilson and Franklin

successfully cut Hinson out of the supply loop. Hinson was someone known to be "soft" and did

not regularly arm himself with a  weapon.  Hinson attended crew meetings and was someone

perceived as a money getter. He was considered high on the chain because he was someone crew

members could get PCP from if Franklin was not available.  During the events of Cts. 46/47 and

Overt Acts 76/77, the undercover officer who approached and brought from Hinson saw him zipping up his pants as he emerged from the alley where he had gone with a female customer. (Sometimes sex was traded for narcotics.)

Larry Gooch (aka "Goo") was considered to be "crazy" and was consequently able to assume the role of "enforcer" or "muscle" in the crew. As a result, he held a supervisory role. Gooch had relatives in the area and grew up on M St. He was involved in selling crack in the beginning of the conspiracy. He called meetings, kicked out crew members who were black balled, and enforced rules that the crew established regarding the sale of narcotics. Some time prior to her murder, Gooch tried to force Yolanda Miller from selling PCP on 18th St. Gooch fired into the air on 18th Pl. to force crew members to move to the more riskier 18th St. to ply their trade so as to make it more convenient for customers to get their product. Gooch fired into the air to distract the police on numerous occasions. He was perceived as having no regard for life and had as his motto, "live for the block, die for the block." People never knew what to expect from him. They did know he always carried a weapon.[3]

Tommie Dorsey (aka "Pinball") was also considered the "muscle." He bragged that his nickname "Pinball" was synonymous with "the M Street Crew." Dorsey was an original crew member and close with Robinson and Gooch since all three were juveniles and served time together at Oak Hill. They engaged in criminal ventures together as juveniles as noted above. Dorsey carried and fired weapons. In several crew photos he is posing holding his hands as if holding two handguns. He was someone who "would put in work" meaning he was viewed

---

[3] Gooch was apprehended on August 30, 2003. There are several calls on the wire between him and Franklin. On one of those calls, they discuss weapons.

more as a gangster, engaged in violent criminal activities than as a money getter.  Dorsey has remained jailed since his arrest in early July, 2003 and was not overheard on the Franklin wire.

Jonte Robinson "aka Black or Te"was also an original member of the crew. He lived in the area on 19th St. and was highly motivated by the financial gain that came from dealing in narcotics.  He was considered a money getter.  But people perceived that the easy money changed him and he developed a reputation for beating up his girlfriend.  He and Anthony Davis were co-owners of the gun used in the Andre McCarson murder and he received financial compensation for the gun when it was sold after use.  After that murder, Robinson agreed to find and harm McCarson's girlfriend, at the behest of his co-conspirators. This plan did not come to fruition.  Robinson was someone who would watch to see who spoke with the police investigators immediately after a violent crime occurred.   Robinson has remained in jail since his arrest in June, 2003 and was not overheard on the Franklin wire.

Keith Odle was not an original crew member nor from M St.; he was from uptown and consequently, had a reputation for caring mostly about the quick financial gain that came from selling drugs.  He brought in two other short term crew members, Africa and FU.  He was well liked because he did what other crew members wanted and was perceived as being a "yes man." Odle lent his cars to others and drove to the clubs.  He bought ammo for his fellow crew members with his Maryland drivers license.  His cars often had been shot up and he bragged he was involved in shootouts.  He had borrowed the Intratec 9mm that he was convicted of possessing in December 16,  2002 from Gooch.  He was someone known to carry a weapon. Odle has been incarcerated since December, 2002.

B.     Evidence Establishing Association or Prior Relationship

Law enforcement agents obtained numerous group photographs which helped to establish the involvement and identity of members of the crew. Usually taken at various night clubs, these photos depict members of 18th and M Street crew in various poses, including many instances wherein members flashed the letter  "M" by twisting their fingers into the shape of the letter M. These photographs form the core of evidence which shows the associations and relationships that the defendants had with one another, and more importantly, demonstrates that they considered themselves to be members of the same organization, the 18th and M Street crew.  Defendants Odle, both Dodds, Hinson, Robinson, Gooch and Dorsey are all depicted in these pictures.

Hours of video surveillance from a pole camera on the block depicts what appears to be innocuous meetings and gatherings between crew members on the strip. This evidence is useful to establish relationships and kinships that crew members had with one another.  Shawn Hinson and Kenneth Dodd are depicted on various video footage.

Cooperators will testify about co-conspirators traveling together to Atlantic City, the beach, Los Angeles, and other destinations, frequenting night clubs together (where band members would recognize their group by engaging in shout outs to M street) and other types of social activities.  The night clubs often were a lucrative place to distribute ecstasy pills. Evidence of these social activities reveal the extent of the network, relationships, kinship and associations that existed between members.

Police officers assigned to PSA 509 (the original PSA that encompassed 18th and M Streets) and the neighboring PSA will testify about their personal knowledge and observations of

-13-

the defendants and the frequency with which they saw the defendants on the street engaged in conduct consistent with drug trafficking. They will testify as to the defendants' actions, frequency of seeing them and how other people related to them. For instance, an undercover officer who participated in this investigation of how she initially approached Shawn Hinson and attempted to solicited PCP from him but he explained he was out and directed her to another person further down the block.

Many of the defendants and co-conspirators have grown up together at various locations in the city. Many had, and still have, family members living in the neighborhood at 18th and M Streets. These are just some of the examples of anecdotal evidence that the Government will offer to show that an association existed and these defendants were part of it.

C.     Uncharged Conduct in Furtherance of the Conspiracy

The Government will offer evidence that does not pertain a specific charge in the indictment but that directly shows conduct in furtherance of the conspiracy. A sampling of the type of evidence that falls within this category includes the hours of video surveillance, suspect phone call conversations, possession of large sums of cash and documentary evidence showing no legitimate source of income.

Video surveillance recorded defendants engaging in conduct consistent with drug trafficking. Kenneth Dodd is seen on video several times greeting and escorting into an apartment a special employee to whom he sold narcotics. For instance, in one clip Shawn Hinson is seen sitting with a fellow crew member who is counting a large sum of money and at other time, Hinson is seen handing an object to someone who then walks over to a car and drives off. Other video surveillance tapes, too numerous to recount, shows actions by the other co-

conspirators.  Both are also seen on video in close proximity to their co-conspirators.

Dialogue from the phone calls intercepted through the various wire taps has also been provided to the defense.  A sampling of the 6917 calls reveals phrases such as "are we in the water?" "test some t-shirts," "bring the vials out," "get your cheese together," "bring two short sleeve t-shirts," "do you have the aspirin?" These conversations, when coupled with cooperator testimony and other evidence that corroborates the drug trafficking evidence, is uncharged conduct in furtherance of the conspiracy.  Kenneth Dodd, Larry Gooch and Shawn Hinson are all on the wire talking to Franklin.

Large quantities of U.S. currency was recovered from Shawn Hinson on the following dates – $800 from Hinson on 3/19/02, $900 from Hinson on 8/20/03 and $7,000 attributable to Hinson on 3/16/04; $400 from Dorsey on 2/28/03 and $900 and a money counter from the apartment shared by April and Kenneth Dodd on 3/16/04.  The drug market is predominately a "cash and carry" trade and the possession of large amounts of currency can suggest its owners' involvement in criminal activity.

The Government obtained the tax records, or the lack of the filing thereof and the lack of W-2 forms, for all of the defendants, (except Keith Odle), from  tax years 1997 through 2004. Documentary evidence showing that the defendants have not been lawfully employed for significant periods of their adult lives is circumstantial evidence tending to prove an assertion that they supported themselves through illicit means.  This evidence has been made available to the individual defendants to comply with the federal laws regarding unauthorized access to federal tax information.

     D.    <u>Involvement in Similar Crimes</u>

Kenneth Dodd was convicted after a guilty plea of Possession with the Intent to Distribute Cocaine in F-510-00 for an offense on January 21, 2000 in the 1400 block of Holbrook St., NE after police stopped his vehicle. (This location is five blocks from 18th and M St., NE.). This event occurred during the pendency of the conspiracy, during the time period and near its primary location. This offense is included in the indictment as Overt Act #1.

Shawn Hinson was convicted after a guilty plea of Attempt Distribution of PCP in F-1746-02 for an offense on March 19, 2002 in front of 1715 M St. N.E. This event occurred during the pendency of the conspiracy, during the time period and at its primary location. This event is also included in the indictment as Overt acts #7 and #8.

Keith Odle was convicted of 18 U.S.C. 922(g) (Felon in Possession) in Federal District Court in Greenbelt, Md. in case # 02-565, for the December 12, 2002 incident involving the possession and transport of an Intratec 9mm from the Classics nightclub in Prince George's County back to Washington, DC. This event is included in the indictment as Overt act #20. [4]

Larry Gooch was convicted of possession of crack cocaine on Nov. 25, 1999 in Federal District Court in Greenbelt, Md., case # 00-145M. This offense occurred while driving on Rt. 295 north of Benning Rd (the Baltimore/Washington Pkwy). Omari Minnis was his co-defendant and Gooch misidentified himself to USPP as Kenneth Dodd. (Both Minnis and Dodd have been identified as fellow crew members). Gooch was adjudicated delinquent for PWID cocaine (guilty plea) for an offense on January 10, 1997 at 1845 M St. NE in J-97-97. Gooch was adjudicated delinquent (guilty at trial) of CPWL (a Browning semi automatic) on January 21,

---

[4] Odle was convicted of PWID cocaine in Montgomery County, Md. in case # 86293. The Government advises counsel of this fact but does not intend to offer such evidence in our case-in-chief.

1997 in J-204-97.  Dorsey was his co-respondent and also adjudicated delinquent after trial in J-200-97.

In addition to the above, Tommie Dorsey was adjudicated delinquent in J-1250-97 for Assault with intent to kill while armed for shooting Dennis Wade, a 14 yr. old, in the head on March 17, 1997 in the 800 block ogf 18th St., NE.  Jonte Robinson was his co-respondent and also adjudicated delinquent in J-950-97 for this offense (guilty plea to Assault with a deadly weapon). Dorsey was adjudicated delinquent to possession of a prohibited weapon – a Tech 9 (PPW) for an offense on April 1, 1997 at the intersection of 6th and Florida Ave., NE (about 2 miles from 18th and M) in J-957-97. This offense involved driving a stolen vehicle and possession of a .380 handgun, ammo and marijuana.  Robinson was his co-respondent in this case as well and also adjudicated delinquent for the PPW offense in J-960-97.  Dorsey was also adjudicated delinquent (after guilty plea) for a robbery in J-1249-97. Significantly, Robinson was also his co-respondent and also pled guilty to this offense in J-1247-97.

Tommie Dorsey was convicted of possession of marijuana in M-12452-00 after a guilty plea. The circumstances of this arrest are that on October 19, 2000, Dorsey was seen to drop to the ground a hat that held 40 zip locks of marijuana in the 1800 block of M St., NE.

Also, a search warrant on November 3, 2000 at Dorsey's home on 1429 11 St., NW led to the recover of a .357 Taurus revolver.

The defendants also have other arrests that occurred during the period of the conspiracy did not result in convictions or adjudications that are not included as overt acts in the indictment. In F-481-00, on January 20, 2000, in the 100 block of 19th St., NE, Larry Gooch was arrested after he threw to the ground a brown paper bag that held 21 zip locks of crack cocaine.  He also

possessed marijuana and $370.  A jury hung on the PWID count but Judge Kramer found him guilty of the possession of marijuana count.

Kenneth Dodd was arrested on November 19, 2002 after a traffic stop in the 1200 block of 18th St., NE lead to the recovery of a vial of PCP under the front seat in F-7456-02.  This case was dismissed.

Tommie Dorsey (M-840-00) and Jonte Robinson (M-839-00) were both arrested along with Kenneth Dodd (F-510-00).  Facts of the arrest are described above; further facts are that Dodd was driving, Dorsey and Robinson were passengers inside the car, when officers approached they smelled marijuana and found cocaine and marijuana inside the car.  A larger quantity was found in Dodd's possession.  The cases were no papered as to Dorsey and Robinson.

Jonte Robinson was arrested in F-1293-03 in the 1200 block of 18th St., NE on March 3, 2003 after midnight when police stopped the woman driving his car for a traffic violation. Robinson was the front seat passenger.  A 9mm Beretta handgun was found under the driver's seat of Robinson's car.  The case was dismissed after a jury was unable to reach a decision as to his guilt.  Jonte Robinson was arrested in F-5113-02 by Officer Carlton Herndon on August 8, 2002 in the rear of 1718 M St. NE at midnight and found with a vial of PCP, $250.00 and 2 boxes of Newport cigarettes.  However, that evidence was suppressed by Judge Ross in the Superior Court and the case dismissed.  Robinson was also arrested for PWID cocaine in F-5422-00 on September 5, 2000 at Florida and 10th St., NW.  This case was expunged after he pled guilty to possession of cocaine and received a PBJ.

Finally, Shawn Hinson has an arrest for narcotic trafficking that occurred at the 18th and

M St. neighborhood but prior to 1997.  Hinson was arrested on August 4, 1995 in the 1800

block of M St. NE in F-6379-95 after he dropped a black cannister to the ground containing 47

zip locks of crack cocaine.  This case was dismissed.

### III. THE EVIDENCE OF THE OTHER ACTS IS ADMISSIBLE IN THE GOVERNMENT'S CASE IN CHIEF

The Government will present evidence and testimony about uncharged drug sales and

acts of violence, evidence that establishes associations or prior relationships, uncharged conduct

in furtherance of the conspiracy and involvement in similar crimes against specific defendants in

Group 3 and submits that such evidence is direct evidence of the conspiracy.  This type of

evidence arises out of the same transaction as the charged offense, is inextricably intertwined

with the charged offense or is necessary to complete or explain the story of the crime on trial.[5]

Direct evidence of the conspiracy is not 404(b) "other crimes" evidence and consequently a great

deal of evidence that the Government will introduce at trial does not fall under the requirements

of Rule 404(b).[6]

In order to prove the charged narcotics and RICO conspiracies, the Government will

_____

[5]  The charged offense being the Narcotics Conspiracy and the RICO Conspiracy that spanned a seven year period.

[6]     Rule 404(b) provides the following:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

present evidence of the defendants' criminal wrongdoing that does not relate to specifically

charged incidents in the indictment, such as a specific overt act.  This evidence  will not be

offered under the authority of Rule 404(b).  Rather, it is independently admissible as direct proof

of the conspiracies with which the defendants are charged.  It is beyond dispute that evidence of

acts which are part of, or "inextricably intertwined" with, a charged crime is direct proof of that

crime and is not subject to Rule 404(b) analysis.  United States v. Badru, 97 F.3d 1471, 1474-75

(D.C. Cir. 1996); United States v. Allen, 960 F.2d 1055, 1058 (D.C. Cir. 1992); United States v.

Diaz, 878 F.2d 608, 614-16 & n.2 & 3 (2nd Cir. 1989); United States v. Edelin, 128 F. Supp. 2d

23, 48 (D.D.C. 2001) ("Evidence of other crimes related to the RICO enterprise and drug

conspiracy charged does not come within the definition of Rule 404(b).").

　　　　This rule applies with even greater force where, as here, the crime charged is a

conspiracy and the so-called "other crimes" are, in fact, direct evidence of the existence of the

conspiracy and/or the defendants' entry into the conspiracy.  "In cases where the incident offered

is a part of the conspiracy alleged in the indictment, the evidence is admissible under Rule

404(b) because it is not an 'other' crime.  The evidence is offered as direct evidence of the fact in

issue, not as circumstantial evidence requiring an inference as to the character of the accused."

Badru, 97 F.3d at 1475 (citing Wright & Graham); see also United States v. Thai, 29 F.3d 785,

812-13 (2nd Cir. 1994) (evidence of uncharged crimes such as robbery, assault and extortion

admitted in RICO trial was not 404(b) evidence; these crimes were independently admissible

since they were in furtherance of the RICO conspiracy); United States v. Escobar-De Jesus, 187

F.3d 148, 168 n.17 (1st Cir. 1999) ("Because we conclude that the Lajas incident was not 404(b)

evidence, but rather was direct evidence of the conspiracy charged, we have no occasion to

decide whether [the witness's] testimony went beyond matters included in the notice required by Rule 404(b)"); United States v. Green, 175 F.3d 822, 831 (10th Cir. 1999); United States v. Garcia Abrego, 141 F.3d 142, 175 (5th Cir. 1998); United States v. Miller, 116 F.3d 641 (2nd Cir. 1997); United States v. Chin, 83 F.3d 83, 87-88 (4th Cir. 1996); United States v. Maceo, 947 F.2d 1191, 1198-99 (5th Cir. 1991);  United States v. Coiro, 922 F.2d 1008 (2nd Cir. 1991); United States v. Tejada, 886 F.2d 483, 486-87 (1st Cir. 1989); United States v. Angelilli, 660 F.2d 23, 39 (2nd Cir. 1981); United States v. Salazar, 485 F.2d 1272, 1276 (2nd Cir. 1973); McCormick on Evidence § 190 at 800 & n.17.

        Moreover, where evidence of the defendants' acts are either inextricably intertwined with a charged conspiracy, or provide evidence of the conspiracy itself, it is admissible without Rule 404(b) analysis, regardless of whether those acts fall outside the period during which the indictment alleges the conspiracy existed.  United States v. Diaz, 878 F.2d at 614-616 & n.2 (crimes, wrongs or acts – that the house was being used as a stash pad – occurring before the alleged inception date of conspiracy were relevant and admissible in drug conspiracy prosecution and did not raise Rule 404(b) question); United States v. Bates, 600 F.2d 505, 509 (5th Cir. 1979) (testimony concerning acts and backgrounds of co-conspirators  – their marijuana importation business and smuggling activities in Mexico –  including evidence of behavior antedating period covered by indictment, was not extraneous evidence of other crimes, but admissible as bearing on the existence and purpose of the conspiracy and the significance of later behavior); United States v. Bermudez, 526 F.2d 89, 95 (2nd Cir. 1975) (upholding admission of traces of narcotics and narcotics-related equipment seized in home six weeks after conspiracy to distribute cocaine ended).

"Rule 404(b) excludes only evidence 'extrinsic' or 'extraneous' to the crimes charged, not evidence that is 'intrinsic' or 'inextricably intertwined.'" United States v. Allen, 960 F.2d 1055, 1058 (D.C. Cir.), cert. denied, 506 U.S. 881 (1992).  "[Evidence that Allen watched his co-conspirator sell to an undercover officer] was an intrinsic part of the witness' account of the circumstances surrounding the offense for which Allen was indicted (and also was relevant both to Allen's intent to distribute and his knowledge about [his co-conspirator's] drug cache." Id. at 1058; see also United States v. Gartmon, 146 F.3d 1015, 1020 (D.C. Cir. 1998) (evidence that defendant charged with fraud had threatened a coconspirator not "other crimes evidence" but instead "inextricably intertwined" with charged offense); United States v. Garces, 133 F.3d 70, 77 (D.C. Cir. 1998) (holding that evidence that "was part of the story" was not other crimes evidence); United States v. Washington, 12 F.3d 1128, 1134-35 (D.C. Cir. 1994), cert. denied 513 U.S. 828 (1994) ("Moreover, 'Rule 404(b) excludes only evidence 'extrinsic' or 'extraneous' to the crimes charged, not evidence that is 'intrinsic' or 'inextricably intertwined.'  The testimony revealing that Early used his cousin's Kaiser Permanente health insurance card to obtain medical treatment was intrinsic to the charged offense because it helped establish his identity as the driver of the Mazda . . ."); Fed. R. Evid. 404(b), Advisory Comm. Note  regarding 1991 Amendment ("The amendment does not extend to evidence of acts which are 'intrinsic' to the charged offense [citation omitted].").

United States v. Badru, 97 F.3d 1471 (D.C. Cir. 1996), is particularly instructive on this point.  In Badru, defendants were charged with conspiracy to distribute and possess with the intent to distribute heroin and actual counts of distribution.  Id. at 1473.  At trial, the government introduced evidence to suggest that the defendants' prior trips to Nigeria were undertaken as part

of their smuggling operation of heroin into the United States.  Id.  The Court of Appeals held that

the evidence was not "other crimes" within the purview of Fed. R. Evid. 404(b); instead, it had

been properly admitted as "intrinsic" other crimes evidence:

> Given the similar modus operandi between the couriers' pervious
> trips to Nigeria and the planning and execution of the trip that
> ended in April 1993 with the seizure of 5,569 grams of heroin from
> the couriers' luggage, a jury reasonably could find that appellants
> conducted the previous trips for the same purpose as the trip that
> ended in April 1993.

Id. at 1475.    Our Court of Appeals has defined intrinsic other crimes by quoting the Eleventh

Circuit:

> "Evidence of criminal activity other than the charged offense is not
> considered extrinsic if it is an uncharged offense which arose out
> of the same transaction or series of transactions as the charged
> offense, if it was inextricably intertwined with the evidence
> regarding the charged offense, or it is necessary to complete the
> story of the crime of trial . . ."

Badru, 97 F.3d at 1474.

Testimony about uncharged drug sales and acts of violence tends to prove the existence,

organization and nature of the RICO enterprise, and shows a pattern of racketeering activity by

each defendant.  For instance, in United States v. Diaz, 176 F.3d 52 (2nd Cir. 1999), the

Government introduced evidence of prior uncharged crimes and other bad acts that were

committed by the defendants and cooperating witnesses.  This included one defendant's drug

dealing, stockpiling of weapons to protect the (Latin King) gang's drug trade and his related acts

of violence;  another defendant's ordering gang members to assault others who sold on their

block,  another's commission of a robbery and testimony from cooperators of their own drug

dealing and acts of violence on behalf of the gang.  The Court dispensed with their claim that

Rule 404(b) governed admission, finding "an act that is alleged to have been done in furtherance of the alleged conspiracy . . . is not an "other" act within the meaning of Rule 404(b); rather it is part of the very act charged." Id. at 79.  Moreover, the Court noted that the trial court could "admit evidence of the prior acts to inform the jury of the background of the conspiracy charged, in order to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators." Id.

Evidence that establishes associations or prior relationships, is also relevant and admissible because it may be proof of the defendant's knowing participation in the conspiracy and be inextricably intertwined with the facts on trial.  Such evidence is intrinsic.  See, e.g. United States v. Johnson, 12 F.3d 827, 831 (8th Cir. 1994) (evidence of the parties' association is relevant to the existence of the conspiracy and the accused's participation; moreover, given that the nature of a conspiracy entails secrecy and an agreement, a members' participation in it is often established by way of inference from surrounding circumstances); United States v. Robinson, 978 F.2d 1554, 1562-63 (10th Cir. 1992) (gang affiliation evidence, such as the Crips' blue clothing and gang posed picture, is "associational evidence" which, standing alone could not support a conviction, but may be directly relevant on the issues of formation, agreement, and purpose of a conspiracy.  "Gang membership helped to establish an agreement among the subjects, the purpose of the conspiracy and knowledge on the part of these defendants."  )

Finally, there are additional arguments to support the introduce evidence of Hinson's (F-1746-02) and Dodd's (F-510-00) prior narcotic trafficking convictions, Gooch's (J-97-97) prior narcotic trafficking adjudication, all of which occurred during the conspiracy and in the heart of the conspiracy's location, and evidence of Odle's (02-565) weapon conviction and Gooch's (00-

145) possession conviction.

Hinson's conviction is included in the indictment as overt acts 7 and 8 and the conviction came about as a guilty plea. Dodd's conviction is included in the indictment as overt act 1 and was the result of a guilty plea. Odle's conviction is overt act 20 and was the result of a guilty plea. The Government submits that the evidence of these convictions is direct evidence of the conspiracy and proof of the conviction is admissible under Rule 803(22). Rule 803(22) states:

> Judgment of previous conviction. Evidence of a final judgment, entered after a trial or upon a plea of guilty (but not upon a plea of nolo contendere), adjudging a person guilty of a crime punishable by death or imprisonment in excess of one year, to prove any fact essential to sustain the judgment, but not including, when offered by the Government in a criminal prosecution for purposes other than impeachment, judgments against persons other than the accused. The pendency of an appeal may be shown but does not affect admissibility.

Dodd, Odle and Hinson's prior plea colloquys and certified convictions will be offered to prove the commission of the charged overt acts.[7] Gooch's conviction (and adjudication) will be offered to prove the commission of uncharged overt acts in furtherance of the conspiracy. The portion of Rule 803(22) that relates to impeachment has no bearing on the admissibility of judgments of conviction of the defendant being offered to prove facts essential to the judgment.

Rule 803(22) clearly supports the admission of defendants' prior felony convictions in this case. Case law demonstrates that prior convictions are admitted for purposes other than impeachment. In United States v. Burrell, 289 F.3d 220 (2d Cir. 2002) the Second Circuit held that a juvenile plea allocution and an adult conviction (both for criminal possession of narcotics) were properly admitted as proof of the overt acts charged in the narcotics conspiracy. Id. at 224.

---

[7] An act, such as possession of crack cocaine with the intent to distribute it, committed in furtherance of the conspiracy need not be pled as an overt act to justify admission.

The Government had admitted two prior convictions, including one juvenile plea allocution, which the defendant challenged under Federal Rule of Evidence 609(d). The Court characterized the 609(d) argument as "irrelevant," noting that the Government sought to admit the evidence not to impeach the defendant, but "rather as direct evidence of his participation in the charged conspiracy." Id. As in this case, the Government in Burrell sought to admit evidence of the prior plea allocution and conviction to prove the conspiracy at issue, not as impeachment or other crimes evidence.

Such evidence was admitted under very similar circumstances in a case from the Southern District of New York. In United States v. Ida, 1997 WL 576105 (S.D.N.Y.), the Government moved into evidence certified records of state court gambling convictions entered by the defendant and four other persons as part of the Government's proof of a racketeering act charging the defendant and others with conducting an illegal gambling business as part of a large conspiracy. Id. at *6. Defense counsel objected to that evidence at trial on relevance grounds, but that objection was overruled and the Court admitted the convictions. In considering a post-trial hearsay challenge to the evidence, the Court found that only a co-conspirator's felony conviction (the defendant's conviction was a misdemeanor) was properly admitted under Rule 803(22), which specifically addresses only felony convictions. In so finding, the Court ruled that Rule 803(22) provided a hearsay exception for the admission of prior felony convictions of a defendant. Id. at *7. (The Court further held, however, that the hearsay objection not made at trial had been waived. Id.). See e.g., United States v. Bailey, 319 F. 3d 514 (D.C. Cir. 2003)("But convictions come into evidence all the time – thanks to the Rules' explicit provision of a hearsay exception, Federal Rule of Evidence 803(22)"). These cases support the admission

of the defendants' prior convictions.  As in <u>Burrell</u> and <u>Ida</u>, the Government  seeks to admit the

prior guilty pleas and convictions, not as impeachment or other crimes evidence, but to show

their participation in the very crime at issue here, the conspiracy.  For these purposes, the

evidence is clearly admissible.

Furthermore, the evidence of defendant Dodd, Odle's and Hinson's previous plea

agreements and admissions during plea colloquies are admissible on a separate, independent

ground – as admissions of a party-opponent under Federal Rule of Evidence 801(d)(2).  Where

the government has an authenticated admission by a defendant, whether signed or under oath, of

certain conduct that is relevant to the charged conspiracy, that admission is not hearsay, and

must be admitted under Rule 801(d)(2).  The Government will provide to counsel copies of the

transcript of the defendants' guilty pleas.

Finally, evidence of the conviction of Dorsey's misdemeanor drug possession (M-12452-

00) is admissible, also under another theory.  Because the criminal conduct at issue here is not a

felony and does not qualify under the above theory, it could also subject to a Rule 404(b)

analysis.  Evidence that Dorsey has been convicted of narcotics possession (with the attendant

implication that the 40 zip locks were not for personal consumption) is relevant and probative to

an issue other than character - in this case, to show intent, knowledge, motive and absence of

mistake and to show the background history of the conspiracy.  Such evidence is also more

probative than prejudicial.  <u>See</u> <u>United States v. Burch</u>, 156 F.3d 1315 (D.C. 1998) (evidence of

prior arrest and conviction for attempt possession with the intent to distribute within the very

same block was relevant to show knowledge and intent); <u>United States v. Rogers</u>, 918 F.2d 207

(D.C. Cir. 1990) (juvenile plea to distribution was admissible to show that he had not merely

picked up someone else's gym bag filled with narcotics "by mistake"); <u>United States v. Crowder</u>, 141 F.3d 1202, 1208 n. 5 (D.C. Cir. 1998) ("A defendant's hands-on experience in the drug trade cannot alone prove that he possessed drugs on any given occasion.  But it can show that he knew how to get drugs, what they looked like, where to sell them, and so forth.")

The Government submits that evidence of the arrests not resulting in convictions or adjudications are also probative on other grounds, and evidence of the conspiracy itself.  For instance, evidence that Dorsey and Gooch were arrested together back in 1997 and likewise Dorsey and Robinson were arrested three times together is relevant to show the genesis of the conspiracy.  This evidence tends to show the connection Dorsey/Gooch/Robinson had with one another as juveniles and demonstrates that they continued their criminal associations into adulthood.  Finally, evidence of the other arrests (Dodd  F-7456-02, Gooch F-481-00, Dorsey M-840-00, Robinson M-839-00, Robinson F-1293-00 and Dorsey M-12452-00) is relevant to show continued participation in the conspiracy, as direct evidence of the conspiracy, and in furtherance of the conspiracy.  See <u>supra</u> at 19.

CONCLUSION

For all of the reasons stated above, the evidence noticed herein is relevant to the charged conspiracy and, in most instances, it is intrinsic to the charges.  It should all be admitted in the government's case in chief.  At the time of the hearing on this, and in any subsequent filing, the government may note additional grounds for the admission of the above-described evidence. Should the government learn of any additional evidence, it will promptly notify this Court and counsel in writing.

WHEREFORE the government gives notice of its intent to use intrinsic evidence in its case in chief and requests this Court allow its admission.

KENNETH L. WAINSTEIN
UNITED STATES ATTORNEY
DISTRICT OF COLUMBIA

By:_____
DARLENE M. SOLTYS
Bar No.: 431-036
Phone: (202) 514-8147
JOHN P. DOMINGUEZ
Bar No.: 959-809
Phone (202)514-7060
Assistant U.S. Attorneys
555 4th Street, N.W.
Washington, D.C. 20530

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Notice has been served on all defense counsel for defendants in Group 3, and April Dodd, this 19th day of July, 2006.

_____
ASSISTANT U.S. ATTORNEY